**Nell G. GILBERT, Plaintiff-Appellant,**

**v.**

**Maurice J. BLUHM and Celia Pekow, an individual and Trustee of Sandra Pekow Trust, and Ruth Levy, an individual and Trustee of Levy Brookside Trust, d/b/a Brookside Hotel, Defendants-Respondents.**

**No. 45075.**

Supreme Court of Missouri.

Division No. 1.

June 11, 1956.

**126**

C. William Garver, and Walter 'A. Raymond, Kansas City, for appellant.

Donald G. Stubbs, Tom J. Stubbs, Stubbs, McKenzie, Williams & Merrick, Kansas City, for respondents.

DALTON, Presiding Judge.

Action for $50,000 damages for personal injuries alleged to have been sustained by plaintiff by reason of defendants' negligence. Plaintiff, a tenant of the Brookside Hotel, 54th Street and Brookside Boulevard, in Kansas City, was injured about 7:30 p. m. on the evening of March 3, 1952, when she slipped and fell on the floor of a waxed incline ramp or hallway as she was approaching the door to the dining room. Verdict and judgment were for defendants and plaintiff has appealed.

■ This court has jurisdiction of the appeal by reason of the amount involved. Article V, Section 3, Constitution of Missouri 1945, V.A.M.S.

■ Appellant assigns error on the admission in evidence of the non-occurrence of other accidents or injuries to other persons using the premises (where plaintiff fell) prior to plaintiff's fall. Respondents, however, insist that the error, if any, was not prejudicial to plaintiff, because plaintiff wholly failed to make a submissible case for the jury on the issue of defendants' liability for plaintiff's injuries. If plaintiff made no case for the jury, she was not prejudiced by the error, if any, in the admission of the evidence complained of. O'Dell v. Dean, 356 Mo. 861, 204 S.W.2d 248; Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S.W.2d 892.

In her first amended petition, plaintiff alleged that defendants "negligently and carelessly caused, allowed and permitted * * * a dangerous condition to prevail *on the surface of a ramp or incline* used by the tenants of said Brookside Hotel * * *; that to enter said restaurant from the lobby was a downgrade ramp which defendants * * * negligently and carelessly *caused to be*

*made dangerously slippery* * * *; that there were *no lights provided to enable* persons and particularly *this plaintiff to see that the said ramp or incline was highly polished and slippery* and * *. * that on or about March 3, 1952, as a direct and proximate result of the negligence of the defendants, their agents, servants and employees, the plaintiff was caused to slip and fall, whereby she sustained compression fractures * * *." (Italics ours.)

Plaintiff's instruction No. 1, submitted a finding, in part, as follows: "* * * that the floor of said hallway had a down slope of approximately 7% to the southwest from said lounge toward said dining room; and that the floor of said hallway was covered with rectangular asphalt tile blocks which the defendants waxed once or twice a month; *and that there was no light in said hallway; and that the light at the junction of the lounge nearest the north entrance of said hallway was shaded and dim;* and that on March 3, 1952, between seven and seven-thirty o'clock in the evening plaintiff started to walk south from said lounge through said hallway to said dining room to have dinner; and that when she had taken about four steps to the southwest down said hallway from said lounge her feet suddenly slipped *on some surplus wax on said floor* and plaintiff fell to the floor with great force and violence and was injured; and *that at said time the light in said hallway was dim; and that by reason thereof, the surplus wax at said point was not reasonably visible to one walking downgrade to the southwest in said hallway in the exercise of ordinary care for her own safety; and that by reason of the dimness of the light, the approximately 7% down-slope* of the flooring *and the surplus wax at the place in question,* if you find such to be the facts, said waxed asphalt tile where plaintiff slipped *was not reasonably safe* for one to walk down in the exercise of ordinary care for her own safety; and if you further find that in maintaining said floor of said hallway in said unsafe condition, if you find it was, for the use of the tenants of said hotel said defendants were not in the exercise of ordinary care and were negligent; and that as a direct and proximate result of said negligence plaintiff fell and was injured, * * *." (Italics ours.)

Appellant says "the case was tried and submitted by plaintiff on the theory that the ramp down which plaintiff was walking when she fell was not reasonably safe because of *a combination of facts,* to wit: dimness due to poor lighting; a down-slope of approximately 7% and an excess of wax making the ramp slick and dangerous." (Italics ours.) Appellant insists that the three named conditions *in combination* made a submissible case. Respondents, on the other hand, contend there was no evidence to support the submission that the hallway was (1) poorly lighted; (2) had too great a down slope; and (3) had an excess amount of wax which made it slippery and dangerous. If plaintiff's evidence was insufficient to sustain the submission of the case to a jury, defendants' motion for a directed verdict should have been sustained and the issue may now be raised, as stated, to avoid a new trial, even if there was error in the admission of evidence on behalf of defendants.

■ No question is raised about plaintiff being a resident and tenant of the Brookside Hotel. She had resided there since July or August 1951. The ramp or hallway leading from the lounge to the dining room was open for the common use of all tenants and the patrons of the dining room. It was 7 feet wide, 17½ feet long, with a drop of 14½ inches so that there was a 6.9% slope. It was covered with asphalt tile and was maintained by the defendants who kept its surface waxed. Of course defendants owed plaintiff a duty to exercise ordinary care to maintain the ramp in a reasonably safe condition for the use for which it was intended. Roman v. King, 289 Mo. 641, 233 S.W. 161, 164, 25 A.L.R. 1263; Schneider v. Dubinsky Realty Co., 344 Mo. 654, 127 S.W.2d 691, 696(15); Peterson v. Brune, Mo.Sup., 273 S.W.2d 278, 280.

As stated, the surface of the asphalt tile on the ramp was kept waxed by employees of the hotel. Plaintiff knew the floor was

covered with asphalt tile and knew of the incline. She used the ramp regularly in going to the dining room. Plaintiff testified that she didn't know that the floor was periodically waxed but said there was no foreign substance on the floor where she fell. Her other evidence showed the ramp was waxed "at least once, but not over twice a month." The janitor (plaintiff's witness) would wash the floor with soap and water and let it dry, then he would pour out a pint or a quart of Reed's liquid floor wax and spread it with a damp mop. He never used any abrasive or detergent. The floor would be slippery after waxing, not real slippery and not so a person would fall. The witness said he would spread the wax evenly and would never go away leaving any excess of wax on the floor. After he waxed the floor "there would be a gloss to it, but there wasn't to be no sheen." He would let the floor dry for ten or fifteen minutes and then go back and inspect it if he found any excess wax or wax that didn't spread evenly he took it up.

Plaintiff's witness Rhodes saw plaintiff fall and ran to her and helped her up. Her feet had slipped out from under her and she sat down rather hard. He examined the floor: "There wasn't anything on it. It didn't seem any more slippery than usual. It had been waxed previously." He didn't know when. "It had been several days before. * * * It was the same as it always was, they kept it up very well. * * * It was always shiny. There was nothing on it. It had just been waxed and was just like any waxed floor." (We do not construe the words "just" to refer to time). It was not slippery to excess. In a prior written statement the witness had said: "The hall where Miss Gilbert fell had been recently waxed and was very slippery * * * and appeared to have a high shine or gloss on the surface."

There were no lights immediately over the ramp. The nearest light at the lounge end of the hallway or ramp was about 3 or 4 feet from the beginning of the ramp. It was a lantern type ceiling fixture with a lamp in the center and a circular brass appearing shade around it, with perforations or designs cut in it, through which the light shone. The nearest lights at the dining room end or bottom of the ramp were 6 or 8 feet inside the dining room and high up so they could not be seen from the ramp. Plaintiff's witness Rhodes testified that the dining room was lighted with three rows of lights, chandeliers hung from the ceiling; that each contained 8 or 10 bulbs screwed in from the bottom; and that the hallway or ramp had the same lighting that it had had all the time when the dining room was open. The light from the chandeliers shone out onto the floor of the hallway and "lit it up." There was nothing to prevent anyone from seeing the floor of the hallway.

Plaintiff herself described the existing lighting situation on the evening of March 3, 1952, as she walked through the carpeted lounge and started down along the center of the hallway or ramp, as follows: There were clusters of lights in the chandelier just inside the restaurant door. The doors consisted of two French doors, which were open. The lights from the dining room were coming out on the ramp but "not heavily up at that end," where plaintiff entered and fell. Concerning the lounge light in the ceiling behind her, plaintiff said: "that light didn't amount to much." Plaintiff further said: "I didn't say there was enough light on that floor that anyone could readily observe any foreign substance if it was on the floor." Plaintiff had proceeded only 3, 4, or 5 feet down the ramp, and was 12 to 15 feet from the dining room doors, when her feet suddenly slipped forward and she sat down hard on the ramp. After Mr. Rhodes picked her up and she was standing, she looked and "saw no water, or nothing spilled from the trays," but, when she leaned over to brush her skirt (she "had wiped up some of the dust on the floor") she noticed her "heel tracks in the wax." "They were skids or gouges," where "both heels went," right where she fell. She wasn't able to see these marks "until she leaned down to brush" her skirt, but then she "could see two gouges where

I had gone this way." "Anyone that fell would get a clean suit dusty." As to the further condition of the floor, plaintiff said "I never saw that floor cleaned up and waxed like that before in all the time I lived there."

There was no direct evidence tending to show that the down slope of the ramp was excessive or that the 6.9% slope was dangerous and unsafe, or that such a slope would cause one to slip or fall. Only the fact of the slope and its extent appear from the evidence.

Respondents contend that "there is no evidence whatsoever that there was any *surplus wax* on the floor of the hallway where plaintiff fell"; that no inference as to the existence of excessive or surplus wax can be drawn from plaintiff's testimony that she noticed "heel tracks in the wax" on the dust covered floor, or from the fact that she saw two skid marks or gouges, "two little scratches" on the floor where she "had gone this way"; that she didn't "lean down and feel of" the marks, as would have been necessary to show indentations; and that the mere visual inspection of tracks, skid marks, gouges or scratches would not sustain the finding submitted as to "some surplus of wax on the floor," and particularly so, in view of plaintiff's two witnesses who said there was no excess of wax on the floor. Respondents insist that there was no evidence tending to show the use of improper floor wax or that it was improperly applied; that plaintiff's own evidence showed a good quality of liquid wax properly applied; and that there was no evidence that the surface of the floor was any more slick or dangerous by reason of any excess of wax. Respondents further contend that "the plaintiff did not testify that the light in the hall was dim, or that it was inadequate, or that she had any difficulty seeing where she was going." Respondents say that plaintiff's testimony that the light from the dining room chandelier did not "heavily" light up the floor, where she fell, 12 to 15 feet from the open dining room doors, and her testimony that the light in the ceiling behind her "didn't amount to much," were mere conclusions and indefinite and insufficient to sustain the finding submitted to the effect that "the light in said hallway was dim," or inadequate for plaintiff's use of the hallway. Respondents further say that plaintiff's first amended petition does not charge defendants with negligence in the construction of the hallway, which admittedly had approximately a 7% slope downward toward the dining room doors; that there was no evidence tending to show the hallway was improperly constructed or the slope not in accordance with good construction practices in the area; that plaintiff could not rely upon an unpleaded and unproven assignment of negligence; and that a conclusion of negligence in maintaining the ramp with "too great a down slope" could not be drawn from the measurements in evidence.

There was substantial evidence that the hallway had a 6.9% slope and was waxed and polished. Considered favorably to plaintiff the evidence was further sufficient to sustain a finding that the floor had been "recently waxed and was very slippery"; and that plaintiff did slip on the waxed and sloping floor and did fall. On the essential issue here presented we think it immaterial whether there was substantial evidence to sustain the submission concerning the presence of "some surplus wax on the floor." The entire submission was in the conjunctive, and if plaintiff assumed an unnecessary burden in respect to *surplus* wax it does not affect the conclusion, hereinafter arrived at, that a case was made for the jury on the issue of the inadequacy of the lighting under the facts shown.

Defendants had knowledge of the recently waxed floor because their own employee had done the work in the regular course of his work. Van Brock v. First National Bank in St. Louis, 349 Mo. 425, 161 S.W.2d 258, 262(8); Douglas v. Douglas, Mo.Sup., 255 S.W.2d 756, 758(6). Plaintiff did not know of this condition and she had never known of the hallway or ramp being waxed "like that" before. Long v. F. W. Woolworth Co., Mo.Sup., 159 S. W.2d 619, 624. The light in the hallway was such that she did not observe the exist-

ing condition until after she fell and was injured.

■ The evidence shows a light in the lounge ceiling, several feet from the entrance to the ramp, but from the facts testified to with reference to the fixture in which the light was placed, a jury could infer that the light was dim and ineffective to adequately light the hallway. The lights in the dining room or restaurant could not be seen from the hallway and from the testimony a jury could infer and find that even with the dining room doors open, the light in the upper part of the hallway would be insufficient for plaintiff to travel the waxed and sloping ramp with reasonable safety. These facts and circumstances together with plaintiff's testimony on cross-examination (that the light in the lounge ceiling "didn't amount to much," that the light from the dining room chandelier didn't reach "heavily" up the hall to the place where she fell and that she was not able to see her heel marks on the floor until she leaned down to brush her skirt) were entirely sufficient to support the submission of the cause to the jury on the theory upon which it was submitted. The evidence was sufficient to support a finding that the light in the 17½ foot long, 7 foot wide, sloping hallway or ramp was inadequate; and that in maintaining the sloping, waxed ramp in the dim lighted condition shown by the evidence, the defendants failed to exercise ordinary care and were negligent.

The case of Busby v. Southwestern Bell Telephone Co., Mo.Sup., 287 S.W. 434, 437 was an action for the negligence of the master in the maintenance of a stairway alleged to have been worn, wet, ill lighted, with slate steps used by the employee and upon which she fell and was injured. In holding that a case was made for the jury, this court said: "As already stated, there was substantial evidence tending to show: (1) that the surfaces of the treads of the steps were worn and irregular, that of the sixth step markedly so; (2) that the steps were wet; (3) that there was not sufficient light to enable one passing down them to see the depressions and that the steps were wet; and (4) that these three conditions in com-

bination caused plaintiff's fall and resulting injury. Can it be held as a matter of law that the conditions just mentioned did not render the stairway not reasonably safe? In determining that question cases holding that steps are not unsafe because worn smooth, Myers v. Strauss, Mo.Sup., 264 S. W. 801, or because wet, Williams v. Chicago, B. & Q. R. Co., 288 Mo. 11, 231 S.W. 954, are without influence. Nor are cases in point which hold that if there be enough light to disclose the existence and general character of the stairway, it is sufficient. Weller v. Consolidated Gas Co., 198 N.Y. 98, 91 N.E. 286, 139 Am.St.Rep. 798. If in this case the steps had been worn and wet, but there had been light enough to plainly disclose those conditions to one using them, or if the light had only been sufficient to enable one to see the general outlines of the steps, and they had been dry and unimpaired by use, a different question would be presented. But with the three conditions operating should not the defendant have reasonably anticipated that they would cause injury to employees required to use the stairway? It was at least a question for the jury." And see Capstick v. T. M. Sayman Products Co., 327 Mo. 1, 34 S.W.2d 480, 482.

Since a case was made for the jury, plaintiff-appellant may properly present the issue that the evidence complained of was erroneously admitted and may have reasonably contributed to produce a verdict for defendants.

In the trial of the cause, and over the objection of plaintiff, the defendants were permitted to prove (by cross-examination of plaintiff's witness who had operated the restaurant in the Brookside Hotel for several years) that he had never known of any person, other than plaintiff, to fall in the hallway in question, and that none had been reported to him. The evidence was admitted over the objection that the evidence was incompetent, irrelevant and immaterial, and not any evidence of the condition or of negligence. After it was admitted, the plaintiff moved to strike the testimony from the record for the reasons theretofore stated and for the further reason that "it would

lead to confusion of issues and (that) it possesses no force as proof of the facts involved." Plaintiff also cited Johnson v. Kansas City Public Service Co., 360 Mo. 429, 228 S.W.2d 796. The trial court refused to strike the testimony because it was a part of the cross-examination of a witness who had testified that he and many others had used the floor at the place in question for a considerable period of time and that the conditions he observed there at the time of plaintiff's fall were the same as they had been before, and because the witness testified concerning his own knowledge. The court was of the opinion the evidence had been approved in sidewalk cases.

. Without objection, the defendants by cross-examination showed that the restaurant served about 200 meals per day; that all patrons of the restaurant had to enter and leave by the hallway in question; and that, accordingly, there "would be the equivalent of four hundred people walking in the hallway in connection with the two hundred meals" each day. Defendants also showed that at least 125 persons lived in the Brookside Hotel; that these people "generally always took their meals in the dining room," entering and leaving by way of the hallway or ramp in question. Most of the tenants were quite elderly. They were generally over 70 years old and many of them had attendants who escorted them to the dining room. They were retired people who had given up their homes to move to the Brookside Hotel. Defendants' counsel argued to the jury that over a period of six months plaintiff had been using the same hallway every day along with these other people; that almost 55,000 trips were made down the hallway by patrons either to the restaurant or from it in the six month period; and that no one, other than plaintiff, had ever fallen.

Appellant argues that there was a conflict between plaintiff's personal testimony and that of some of her witnesses, particularly as to the amount of the light in the hallway and whether the hallway was in the same or a different condition from that in which it was usually maintained. We have noted these differences in reviewing the evidence.

It is true that there was a conflict between plaintiff's own testimony and that of some of her witnesses concerning the lighting in the hallway and the condition of the floor, but at the time the questioned evidence was admitted over plaintiff's objection and at the time the several motions to strike were ruled, the plaintiff had not testified concerning any such conflicting facts. The motion to strike was not renewed after plaintiff testified concerning the condition of the floor and the amount of light. Nevertheless we do not consider this fact material. The record further shows that all of the persons using the ramp prior to plaintiff's fall could not have been using it under the same or similar conditions as those existing when plaintiff fell. The wax was cleaned off and replaced and the floor polished once or twice during each month. An inference could be drawn that, in view of the number of persons using the ramp, its condition immediately after each new waxing would be materially different from its condition immediately before it was cleaned and waxed.

Respondent contends "that the admission of evidence of no previous falls in this hallway, where there was also evidence that the condition of the hallway had been exactly the same during the period in question, and where the evidence was direct and not hearsay, ought to be left to the sound discretion of the trial court." Respondents argue that evidence showing that there were no accidents in the hallway is relevant to show that the condition of the hallway was not dangerous. In Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S.W.2d 723, 727, the Court said: "It was shown that from 1,500 to 2,000 persons walked over this floor every month and that the only person who had ever previously fallen on it had snow on his shoes. This certainly shows a condition which would not be reasonably anticipated to be the cause of injury to customers in the usual exercise of ordinary care for their own safety." No issue as to the admissibility of such evidence was ruled in that case.

Respondents also say that plaintiff could have introduced evidence of prior falls to show the dangerous condition of the hall and that defendants knew of it. Wood v. St. Louis Public Service Co., 362 Mo. 1103, 246 S.W.2d 807, 815(12). Respondents further say "Missouri seems to be unique in holding both that evidence of previous accidents is not admissible and that evidence of no previous accidents is not admissible"; that if "the relevancy of both types of evidence be admitted, and if no general rule of policy excludes the evidence of previous accidents, * * * there is no sound basis for the categorical exclusion of all evidence with regard to the previous safety-history of a condition, such as the hallway involved in the present suit."

■ We think the particular issue has been so clearly, so recently and so definitely decided adversely to respondents, as respondents in effect concede, in the case of Johnson v. Kansas City Public Service Co., supra, 228 S.W.2d 796, 797, that a reference to that case should be sufficient to dispose of the matter. In that case this court stated: "While there is a difference of opinion upon the subject, the weight of authority seems to support the view that evidence showing the non-occurrence of other accidents is not competent to show that a place where an accident occurred was reasonably safe and free from danger. Such evidence is held to be inadmissible because it has no reasonable tendency to prove that a place of injury was free from danger and because it raises collateral issues which have a tendency to confuse and mislead the jury." In that case the court considered the matter at length and held that: "The evidence of the motormen as to the non-occurrence of other accidents was inadmissible because it introduced a confusion of issues and because it did not reasonably tend to prove that the front vestibule of the streetcar was free of the claimed defect." 228 S.W.2d 796, 799. And see Dill v. Dallas County Farmers' Exchange, Mo.Sup., 267 S.W.2d 677, 681; Schillie v. Atchison, T. & S. F. R. Co., 8 Cir., 222 F.2d 810, 815; Annotation 31 A.L.R.2d 190, 203, 226.

■ The evidence in question here to the effect that no other person than plaintiff had ever fallen on the hallway in question was prejudicial to appellant and was erroneously admitted in evidence.

The judgment is reversed and the cause remanded.

All concur.