**Ollie FLOWERS, Plaintiff–Appellant**

v.

**John FLOWERS and Marilyn Flowers, and Mid–Missouri Bank, Defendants–Respondents**

**Leo Flowers, Intervenor.**

**No. SD 28925.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 14, 2009.

James A. Hanson, Cox & Associates, LLC, Sedalia, MO, for Appellant.

Daniel D. Whitworth, Whitworth, McPherson & Longnecker, LLC, Joplin, MO, for Respondents John and Marilyn Flowers.

JOHN E. PARRISH, Judge.

Ollie Flowers (plaintiff) appeals a judgment in a case she brought against defendants John Flowers, Marilyn Flowers, and Mid–Missouri Bank[1] (collectively referred to as defendants[2]). Plaintiff asserted claims for fraudulent misrepresentation[3]

1. Mid–Missouri Bank was formerly known as Webb City Bank. It will be referred to as "the bank" when necessary to identify it separately from other defendants.

2. Because the individual defendants possess the same surname, John Flowers and Marilyn Flowers will be referred to in this opinion by their first names when necessary to identify them individually.

3. The relief plaintiff sought for the alleged fraud in Count I was cancellation of a quit-claim deed she contends was the product of fraudulent misrepresentation by John. A fraud victim may elect to forego damages that could be sought in a tort action at law and request that an instrument that is alleged to be the product of the alleged fraud be rescinded in an action in equity. *Alexander v. Sagehorn*, 600 S.W.2d 198, 200 (Mo.App.1980).

(Count I), punitive damages (Count II), quiet title (Count III), and reformation of deed (Count IV). Another party, Leo Flowers, John's father, intervened in the action. Following trial before the court without a jury, judgment was entered in favor of defendants and against plaintiff and against Leo Flowers (defendant/intervenor) on all four counts. This court affirms but remands with directions to the trial court.

Plaintiff became sole owner of certain real estate (the Madison property) May 19, 2003, upon the death of her husband, Gene L. Lee. The real estate is located at 604 S. Madison, Webb City, Missouri.

Plaintiff married defendant/intervenor on September 11, 2003. On October 30, 2003, plaintiff conveyed an undivided one-half interest in the Madison property to defendant/intervenor by warranty deed that was thereafter recorded in the deed records of Jasper County, Missouri. On August 3, 2004, plaintiff and defendant/intervenor signed a quitclaim deed transferring title to the Madison property to John and Marilyn. The quitclaim deed was thereafter recorded in the deed records of Jasper County, Missouri. On September 7, 2004, John and Marilyn borrowed $101,069 from the bank. The loan was evidenced by a promissory note secured by a deed of trust on the Madison property.

A number of events preceded the conveyance of the Madison property to John and Marilyn. Plaintiff and defendant/intervenor resided at the Madison property after their marriage. They experienced financial difficulties and borrowed money from John and Marilyn. John requested that plaintiff and defendant/intervenor execute a promissory note for the loans he and Marilyn made to them. However, plaintiff and defendant/intervenor came to John's workplace the morning the promissory note was to be signed. They told John they wanted to sign the house over to him. There had been no prior discussion of that possibility.

John, plaintiff, and defendant/intervenor went to Abbey Title Co. John traveled to the title company separately from the other two. They had previously made an appointment to meet there in order for plaintiff and defendant/intervenor to sign the promissory note John had requested.

John was asked if there had been a discussion at the title company about what document would be signed. He stated that the title company employee, Leann Doss, asked plaintiff if she understood that signing a quitclaim deed would convey the Madison property to John. John told the trial court, "And [plaintiff] did say yes, she wanted me to have the property and that was at the signing of this document."

Leann Doss testified. She said that she notarized the quitclaim deed that plaintiff and defendant/intervenor signed. Ms. Doss was asked the following questions about what occurred and gave the following answers.

Q. And you had a conversation with at least [plaintiff], and [defendant/intervenor] was there too, about the legal ramification of executing that deed, is that true?

Q. Yes.

Q. And did they in fact then both sign the deed?

A. Yes, they did.

Q. And did you notarize the deed after it was signed?

A. Yes.

Q. And did you have it recorded? Did you send it off to be recorded?

A. Yes, I did.

Ms. Doss gave plaintiff and defendant/intervenor a copy of the quit claim deed they had signed.

Plaintiff and defendant/intervenor continued to live at the Madison property. John loaned additional money to them. He gave defendant/intervenor $3,000 to purchase a bucket truck. He posted bond—he thought the amount was $250—when defendant/intervenor was jailed for "some sort of a problem." John testified that he had previously paid amounts that totaled $13,508.99 for obligations plaintiff and defendant/intervenor had incurred.[4]

At a later date, a real estate developer, Steve Vogel, expressed an interest in purchasing the Madison property. Contracts were signed by John and Marilyn and, in order that there would be no misunderstanding, by plaintiff and defendant/intervenor. The latter contract was signed at the request of John. John asked them to sign the contract the day before he signed his contract. He explained he did so to avoid "any misconceptions or any differences in the fact that they understood that [he] was selling the property." The prospective purchaser paid $5,000 when the contracts were signed. Plaintiff and defendant/intervenor received $2,600 and $2,400 was applied on money owed for the purchase of defendant/intervenor's bucket truck.

Plaintiff and defendant/intervenor approached John and Marilyn about moving out of the house on the Madison property. John was told "that [defendant/intervenor] was having trouble getting up and down [stairs in the house], his back had bothered him substantially, they had looked at multiple other properties but they really would like to see the house at 1650 Prigmore [(the Prigmore property)]." John

and Marilyn owned the Prigmore property.

Arrangements were made for plaintiff and defendant/intervenor to move into the Prigmore property. They moved there in March 2005. Plaintiff and defendant/intervenor lived at the Prigmore property until August 2005, at which time plaintiff moved from the property and filed a petition for dissolution of her marriage to defendant/intervenor.

The sale of the Madison property was to close August 22, 2005. Plaintiff filed a *lis pendens* claim on the Madison property. The sale did not close.

Plaintiff asserts four points on appeal. Point I claims that the trial court erred in finding against plaintiff on her claim of fraudulent misrepresentation. Point II contends the trial court erred in finding the quitclaim deed to John and Marilyn was valid. (Points I and II argue that the evidence was not sufficient to support the decision of the trial court.) Point III argues, "[a]lternatively to Points I and II," that the trial court erred in not granting "equitable relief" in the form of a constructive trust. Point IV contends the trial court erred in holding that the bank that held the deed of trust on the Madison property was a holder in due course, that the trial court misapplied the law in so holding.

None of plaintiffs' points on appeal are models of compliance with Rule 84.04. Rule 84.04(a) states what an appellant's brief must contain. The requirements include that briefs shall have points relied on. Rule 84.04(d)(1) states the requirements for points relied on in cases where

---

4. This amount was represented by checks as follows: $1,300 to Bill Foster, $1,219 to Stephen Holt for real estate taxes on the Madison property, $5,764 to Southwest Missouri Bank to pay off a balance owed on plaintiff's car, $4,394.02 to Southwest Missouri Bank for cash for plaintiff and defendant/intervenor, and $831.97 for real estate taxes on the Madison property.

review of a trial court's decision is sought. It provides that each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: "The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*]."

Point I states:

The trial court erred in not finding a fraudulent misrepresentation because the weight of the evidence clearly indicates a fraudulent misrepresentation in that the evidence clearly indicates that the purported transfer of title was not a gift and no substantial evidence exists in this record to support the findings, conclusions and judgment of the trial court.

■ Point I does not state, in the context of the case, what evidence would have supported a finding of fraudulent misrepresentation. It does not identify, in the context of the case, particular findings and conclusions of the trial court that were not supported by substantial evidence. It leaves the task of seining the argument (and perhaps the record) to this court to try to determine what evidence indicates the conveyance of the Madison property was not a gift. "Deficient points relied on do not preserve issues for appellate review." *Bolz v. Hatfield,* 41 S.W.3d 566, 571 (Mo.App.2001).

■ This court may, nevertheless, exercise its discretion and attempt to resolve issues on their merits, although the points on appeal do not comply with Rule 84.04, unless the defective point impedes the disposition of the case on its merits. *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 647 (Mo. banc 1997). Deficiencies in briefing requirements impede disposition on the merits if the brief fails to give notice of the basis for the claimed error. *Id.* To the extent the meaning of Point I can be gleaned from plaintiff's argument and to the extent that the respondents' brief has gained an understanding of Point I, the issues will be addressed on the merits.

■ This court's review is undertaken in accordance with Rule 84.13 in that the trial court heard the case without a jury. The judgment will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Kiener v. Powell,* 865 S.W.2d 864, 865 (Mo. App.1993). The evidence and permissible inferences consistent with the trial court's findings are accepted and contrary evidence is disregarded. *Artilla Cove Resort, Inc. v. Hartley,* 72 S.W.3d 291, 293 (Mo. App.2002). This court defers to the trial court in its assessment of the credibility of witnesses. *Id.*

■ As best this court can discern, plaintiff's assertion of error in Point I is founded on the argument that the execution of the quitclaim deed by which the Madison property was conveyed to John and Marilyn was based on a representation by John and Marilyn that they would convey fee simple title to the Prigmore property to plaintiff and would pay to plaintiff the sum of $37,900. Plaintiff claims this was a fraudulent misrepresentation that warrants cancellation of the quitclaim deed. John Flowers testified to the contrary. He told the trial court that there

was no agreement that the Prigmore property would be conveyed to plaintiff or to plaintiff and defendant/intervenor, nor was there an agreement to pay $37,900.

A suit to have a deed declared void invokes the most extraordinary power of equity. *Miller v. Minstermann,* 266 S.W.2d 672, 679[1] (Mo.1954). Consequently, a party seeking cancellation of a deed bears the burden of establishing by clear, cogent, and convincing evidence the basis for exercising such power. *Blackburn v. Spence,* 384 S.W.2d 535, 539[4] (Mo.1964).

*Gregg v. Georgacopoulos,* 990 S.W.2d 120, 123 (Mo.App.1999). "The evidentiary burden imposed by the clear, cogent, and convincing standard of proof requires that the trial court be clearly convinced of the proposition to be proved." *Celtic Corp. v. Tinnea,* 254 S.W.3d 137, 141 (Mo.App. 2008).

Plaintiff contended she did not understand what she was signing when she executed the quitclaim deed to the Madison property. The trial court found the testimony of the notary public before whom plaintiff and defendant/intervenor signed the quitclaim deed credible. The notary told the trial court that she believed plaintiff and defendant/intervenor understood the instrument they signed and its significance. The notary said she explained to them that the purpose of the quitclaim deed was to convey their interest in the Madison property to John and Marilyn. The trial court found the testimony of plaintiff and defendant/intervenor that they did not know what they were signing not to be credible.

According to plaintiff and defendant/intervenor, the $37,900 they contend they were to receive was to come from the purchase price of the sale of the Madison property to real estate developer Steve Vogel. Defendant/intervenor explained:

> Well, Vogel was supposed to buy our house on Madison and we was going to go looking for another property. And John said he had that house on Prigmore and we could move in that and when Vogel settled with us, he'd take $100,000.00 and give us a deed to the property on Prigmore.

Defendant/intervenor was asked if he and plaintiff were supposed to receive other money. He answered, "Yes, the balance of the $137,900.00."

The timeline of the conveyance of the Madison property to John and Marilyn, the move from that property by plaintiff and defendant/intervenor to the Prigmore property, and the proposed sale of the Madison property to Vogel does not support plaintiff's argument that the events were related. The Madison property was conveyed to John and Marilyn in August 2004. Plaintiff and defendant/intervenor did not express an interest in moving to the Prigmore property until February 2005. They moved to the Prigmore property in March 2005.[5]

Steve Vogel, the real estate developer, had not been involved in any discussion with any of the parties before the time the Madison property was conveyed to John and Marilyn. Vogel appeared in February 2005 when he expressed an interest in buying the Madison property. Plaintiff referred Vogel to John. Following discussions between John and Mr. Vogel, a contract for the sale of the Madison property was executed. The contract was prepared

---

5. In order to accommodate plaintiff and defendant/intervenor's wish to move to the Prigmore property, John had to ask tenants that had been renting the Prigmore property for three years to move. He did so in an attempt to accommodate plaintiff and defendant/intervenor. The tenants moved to the Madison property.

by Vogel. It provided for a sales price of $135,000 and set August 19, 2005, as the closing date for the sale.

John testified that plaintiff and defendant/intervenor told him they desired to convey title to the Madison property to him and Marilyn. He learned they were frustrated with other children "in both sides of the family." He told the trial court, "[T]hey told me that they wanted me to have that house. And I was really caught off guard, this was not discussed between me and my wife, it wasn't discussed between me and them." He explained, "They said none of the other siblings had offered to help them through all the problems that they were having, nobody would loan them any money, nobody did anything for them but Marilyn and I[sic]." John said he questioned them about "why they would even do this." He continued, "[Plaintiff] was right there with [defendant/intervenor], she told me that Dennis [6] had taken advantage of her and her plumbing business that Gene had owned previously and he wasn't going to have the opportunity to do that in the future."

A trial court is in a better position to judge the credibility of witnesses, their sincerity, character and other intangibles than is an appellate court that limits its review to the study of a written record of testimony. *Francka v. Francka*, 951 S.W.2d 685, 690 (Mo.App.1997). Appellate courts defer to trial courts in assessing the credibility of witnesses. *Artilla Cove Resort, Inc. v. Hartley, supra.*

The trial court heard the evidence. It concluded that plaintiff failed to show by clear, cogent and convincing evidence that the conveyance of the Madison property to John and Marilyn was the result of a fraudulent misrepresentation; that there was substantial evidence to the contrary. There was no abuse of discretion by the trial court in its finding that there was no fraudulent misrepresentation and in its refusal to cancel the deed by which plaintiff and defendant/intervenor conveyed the Madison property to John and Marilyn. Point I is denied.

Point II argues that the trial court erred in not canceling the quitclaim deed by which the Madison property was conveyed to John and Marilyn "because the weight of the evidence clearly indicates said deed was void in that the evidence of constructive fraud is so substantial as to require cancellation and no substantial evidence exists in this record to support the findings, conclusions and judgment of the trial court to the contrary."

Point II shares the same shortcoming as Point I. It does not state, in the context of the case, in what respect the evidence would support a finding of constructive fraud, nor does it identify in what manner the evidence that was adduced did not support the trial court's findings, conclusions, and judgment. *See* Rule 84.04(d)(1)(C). Regardless, plaintiff did not seek relief from the trial court on the basis of a constructive fraud.[7] "Courts have power to decide only those questions which are presented by the parties in their pleadings." *Sisk v. McIlroy and Associates*, 934 S.W.2d 567, 571 (Mo.App.1996). "An appellate court will not, on review, convict a trial court of error on an issue

---

6. Plaintiff has four children from a previous marriage. One was named Dennis.

7. Constructive fraud is a basis for establishing a constructive trust in order to restore to the rightful owner property that is being wrong-

fully withheld by another party. *See Fix v. Fix*, 847 S.W.2d 762, 765 (Mo.banc 1993). Constructive fraud is found when a breach of a fiduciary or confidential relationship has occurred. *Id.*

that was not put before it to decide." *Mitalovich v. Toomey,* 217 S.W.3d 338, 341 (Mo.App.2007). Point II is denied.

■ Point III states:

Alternatively to Points I and II, the trial court erred in failing to grant equitable relief because the evidence clearly indicated the existence of a constructive trust in that title to the real property in question was conveyed for a specific purpose which was not fully performed by Respondent John Flowers.

There was testimony that refuted plaintiff's claim that the Madison property was conveyed to John and Marilyn in exchange for a promise to convey other property and pay a sum of money. Furthermore, plaintiff did not plead the existence of a constructive trust as a theory for recovery. *See* n. 7, *supra.* "[A]n issue which was never presented to or decided by the trial court is not preserved for appellate review." *Mitalovich, supra.* Point III is denied.

■ Point IV complains that the trial court erred in finding that the bank was a holder in due course. Plaintiff asserts that the trial court misapplied the law; that holder in due course is a doctrine applicable to negotiable instruments, not deeds of trust.

The use of holder in due course language in the judgment is not a determinative factor in this appeal. As plaintiff concedes in her brief, the critical question with respect to the validity of the judgment is whether John and Marilyn had authority to convey an interest in the Madison property as security for the promissory note they executed in exchange for the loan they acquired from the bank. Plaintiff's argument in that regard is that the quitclaim deed to the Madison property was void for one or more of the reasons asserted as claims of error in Points I, II and III; that, therefore, John and Marilyn had no legal interest in the Madison property that could be conveyed by deed of trust as security for their loan. Having denied plaintiff's claims in Points I, II and III, Point IV is moot. John and Marilyn had legal title to the Madison property and could, therefore, encumber the property by means of a deed of trust in order to secure the loan they obtained.

One further issue requires discussion. Count III was an action to quiet title to the Madison property. A legal description of the Madison property is included in the trial court's judgment. The judgment declares "that under Count III [the quiet title action], judgment is awarded in favor of [defendants]; and against [plaintiff and defendant/intervenor]." Although this determination resolves the disputes between the parties, it does not affirmatively declare each of their respective interests in and to the Madison property. It is necessary that be done to avoid future ambiguity. *See, e.g., Harrington v. Muzzy,* 258 S.W.2d 637, 638 (Mo.1953); *Main Street Feeds, Inc. v. Hall,* 944 S.W.2d 328, 329–30 (Mo.App.1997); *Village of Climax Springs v. Camp,* 681 S.W.2d 529, 534 (Mo.App. 1984). The judgment is affirmed. The case is remanded, however, with directions that the trial court amend its judgment to include an affirmative declaration of the respective interests of each party to litigation in and to the Madison property.

LYNCH, C.J., and BURRELL, P.J., concur.